Scott J. RAFFERTY, Plaintiff,

v.

NYNEX CORPORATION, et al., Defendants.

Civ. A. No. 87–1521.

United States District Court, District of Columbia.

July 23, 1990.

Scott J. Rafferty, Washington, D.C., for plaintiff.

Scott W. Muller, Linda Chatman Thomsen, Davis Polk & Wardwell, Washington, D.C., Guy Miller Struve, James D. Liss, Richard M. Baumann, David C. Howard, Seth R. Lesser, Davis Polk & Wardwell, New York City, for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Pending before the Court is the summary judgment motion of defendants NYNEX Corp. and Telco Research Corp. (a NYNEX subsidiary), seeking the dismissal of a number of antitrust, contract, and tort claims relating to plaintiff's termination as a senior vice president of Telco. Plaintiff, a lawyer who is proceeding *pro se*, asserts that he was fired as a result of inquiries he made to determine whether Telco was violating the consent decree entered in *United States v. American Tel. & Tel.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Upon its consideration of the parties' voluminous papers, the Court grants the motion in part and denies it in part.

### I Facts

In April 1986, NYNEX acquired Telco and recruited Rafferty to serve as its second senior officer and the head of its consulting division. NYNEX is a Regional Company subject to the consent decree entered on August 24, 1982 in the *AT & T* antitrust case, which bars the Regional Companies from certain lines of business— long distance telephone services, telecommunications manufacturing, and information services.[1] Telco markets telecommunications management software and consulting services.

Rafferty has alleged that Theodore Engkvist, a NYNEX executive and chairman of Telco's board, informed him that the company had obtained a waiver to perform, *inter alia*, non-software consulting, although the company had obtained only a "software waiver" to provide and market software and associated services which did not cover its non-software consulting operations.[2] Plaintiff was concerned whether the activities of his division complied with the decree, and he asked NYNEX's attorneys on October 20 and 22, 1986 to provide an opinion letter confirming Engkvist's representations that the activities were within the scope of the waiver.[3] On November 10, 1986, Telco's management discharged Rafferty for what it asserts are legitimate reasons, and it closed the consulting division he had been hired to head. Eventually, plaintiff brought this action, which consists of six separate claims.

■ The Court analyzes below each of these claims in light of the facts and the law adduced by the parties. This task has been complicated by the fact that the plaintiff who, although a lawyer, appears to have limited familiarity with several of the legal issues and principles involved. Additionally, the basis for plaintiff's reasoning and his conclusions are not always easy to follow, *see, e.g.*, notes 6 and 9, *infra*, and, as the Court occasionally notes at appropriate places, he sometimes misrepresents the law, the facts, and the position of his opponents,[4] and he quotes statements from

---

1. *AT & T*, 552 F.Supp. at 226–34. Rafferty's description of the decree as purportedly restricting the Regional Companies to three lines of business (Opposition at 1) is incorrect.

2. NYNEX disputes Rafferty's account of the scope of the waiver and of what he was told about the legality of Telco's consulting operation under the consent decree. The Court, however, must accept Rafferty's account of these events for purposes of the motion for summary judgment.

3. Plaintiff also asserts that on several other occasions he brought to NYNEX's attention activities involving Telco that he believed to be violative of the decree.

4. For example, and simply for purposes of illustration of a wider phenomenon, plaintiff contends that it is defendants' claim that the Court

is barred as a matter of law from allowing a jury to disbelieve his witnesses (Opposition at 11); that there is no genuine dispute as to the evidence on the wrongful hire and employment theory (Opposition at 23); that with respect to the second claim NYNEX "relies exclusively on [the] *Control Data* [case]" (Opposition at 24); and that all but one of defendants' antitrust precedents deal only with the admissibility of consent decrees at trial (Opposition at 17). None of these statements is true. *See also*, note 18, *infra*, and the litany of plaintiff's false or unsupported statements in defendants' Reply at 32–35.

Inasmuch as Rafferty is a member of the bar who apparently could afford to hire competent counsel but refuses to do so, the Court will in the future hold him to the same standard as other members of the bar. Accordingly, misrepresentations or misstatements of law or fact

court decisions out of context.[5] Because plaintiff is proceeding *pro se*, the Court has attempted to ascertain or construct what he meant where the rationale of his assertions is confusing, and on that basis some of his claims are upheld. However, greater exactitude and less verbosity [6] will be required hereafter.

## II *First Claim: Antitrust*

Plaintiff's first claim seeks redress for what he broadly describes as a violation of the antitrust laws. As best as the Court can tell,[7] Rafferty alleges that his termination for seeking legal advice [8] and for refusing to acquiesce in violations of the consent decree, as well as other actions taken by Telco and NYNEX, violated the decree and therefore also Section 4 of the Clayton Act.[9] There are several flaws to this claim of a violation of Section 4.

First. Section 4(a) of the Clayton Act grants a private right of action to persons injured "by anything forbidden by the antitrust laws." Section 1 of the Act, 15 U.S.C. § 12, contains a specific definition of "antitrust laws" for purposes of Section 4(a), and that definition is "exclusive." *Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 375–76, 78 S.Ct. 352, 353–54, 2 L.Ed.2d 340 (1958). *See also, New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*, 332 F.2d 346, 350 (3rd Cir.1964), *aff'd*, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965) ("antitrust laws" means specific statutes listed in Clayton Act Section 1; other statutes not included). There is no support for the proposition that violation of a consent de-

---

may, in appropriate circumstances, lead to sanctions.

5. *See, e.g.,* p. 329, *infra.*

6. In addition to his thirty-nine page memorandum, plaintiff has filed a "concise" statement of issues consisting of sixty-one pages. That statement fails to comply with Rule 108(h) of the Rules of this Court, in that it includes pages upon pages or facts that are entirely irrelevant to the motion for summary judgment. In part, this may be due to inexperience (*see* p. 326, *supra* ), but the filing is also consistent with plaintiff's practice of sometimes inundating the Court and the opposing party with materials in large volume, some of them relevant, many of them irrelevant, and some of them relevant to other pleadings or lawsuits plaintiff may have pending, so as to lay the groundwork for later complaints that not everything had been controverted or decided. Another effect of this practice is to compel the opposing party and the Court to refine the issues on their own so as to permit them to make presentations or judgments on the question whether there are genuine issues of material fact. That is, of course, improper. *See Frito–Lay v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988). *See also,* note 39, *infra.*

Nevertheless, the Court has waded through this material on this occasion (although it could have deemed defendants' proposed facts to be admitted on account of plaintiff's failure to comply with Rule 108(h)). *See Simpson v. WMATA,* 688 F.Supp. 765, 768 (D.D.C.1988). However, hereafter it will require this plaintiff, like all litigants, to comply with the rules of procedure. *See also,* note 4, *supra.*

7. Rafferty's description of his first claim is headed "Antitrust Whistleblowing"—a non-existent legal category. His legal argument on this claim is divided into various sections that are inappropriate for a summary judgment brief.

8. Defendants argue at length (Memorandum at 31–38) that the facts do not support plaintiff's claim that he was terminated, *inter alia*, because he sought legal advice. It is not necessary to decide the factual dispute underlying this antitrust claim, and the Court does not do so.

9. The claim fails to provide an explanation of the statutes and theories which support it. In answers to interrogatories Rafferty asserts that Count Two refers to a violation of Section 4 of the Clayton Act, and that there is no evidence of violations of Sections 1 and 2 of the Sherman Act. Response to Interrogatories 1–3. In his Opposition to the motion for summary judgment, however, Rafferty suggests that "defendants cannot establish at summary judgment that there is no relevant violation of Sherman Sections 1 or 2." Opposition at 19 & n. 14. Even if the issue were open in view of the interrogatory answers, plaintiff could not possibly establish either market power in the consulting market or the requisite combination or conspiracy for a Sherman Act claim. *See, e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 759–77, 104 S.Ct. 2731, 2735–45, 81 L.Ed.2d 628 (1984). Further, there are no citations to the discovery record and no explanation of the theories that lead plaintiff to his conclusion. Such unsupported and conclusory statements are insufficient to withstand a motion for summary judgment. *See* Rule 56(e), Fed.R. Civ.P.

cree violates Section 4 of the Clayton Act.[10]

Indeed, it has been specifically established that a private party cannot premise a treble damage action under Section 4 upon violations of a government consent decree. *Paul M. Harrod Co. v. A.B. Dick Co.*, 194 F.Supp. 502, 504 (N.D.Ohio 1961);[11] *See also, Sound, Inc. v. American Tel. & Tel. Co.*, [1979–2] Trade Cas. ¶ 62,974, at 79,-547–48 (S.D.Iowa 1979, aff'd, 631 F.2d 1324 (8th Cir.1980)); *Cinema Service Corp. v. Twentieth Century–Fox Film Corp.*, 477 F.Supp. 174, 177–78 (W.D.Pa.1979); *Control Data Corp. v. International Business Machines Corp.*, 306 F.Supp. 839, 846 (D.Minn.1969), aff'd, 430 F.2d 1277, 1278 (8th Cir.1970).

Second. The weight of authority holds that employees do not have standing under Section 4. *See, e.g., Adams v. Pan American World Airways, Inc.*, 828 F.2d 24 (D.C. Cir.1987). Plaintiff relies on *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 744 (9th Cir.1984), and *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1429–30 (S.D.N.Y.1986), which create an exception for "whistleblowers," but most of the courts which have considered the issue have rejected the holding of these cases. *See Fallis v. Pendleton Woolen Mills, Inc.*, 866 F.2d 209, 210 (6th Cir.1989); *Bichan v. Chemetron Corp.*, 681 F.2d 514 (7th Cir.1982); *Boisjoly v. Morton Thiokol*,

706 F.Supp. 795, 804–05 (D.Utah 1988); *Thomason v. Mitsubishi Electric Sales of America, Inc.*, 701 F.Supp. 1563, 1570 (N.D.Ga.1988); *Reitz v. Canon USA Inc.*, 695 F.Supp. 552, 553–54 (S.D.Fla.1988), and *Haigh v. Matsushita Electric Corp.*, 676 F.Supp. 1332, 1346 (E.D.Va.1987).[12] In any event, Rafferty has testified that he is not a whistleblower. Rafferty Deposition at 1088–89. Accordingly, the Court can find no basis for extending the holding of *Ostrofe* and *Donahue*[13] to the circumstances here.

Third. Plaintiff asserts that he suffered the requisite "antitrust injury" because he lost his job at Telco and has not secured comparable employment. However, "only harm stemming from a reduction in competition qualifies as an injury cognizable under the antitrust laws." *Adams*, 828 F.2d at 26.[14] Rafferty does maintain that he was an "arguable beneficiary" of the allegedly illegal conduct while employed by Telco, Opposition at 20–21, but he does not—indeed he cannot—contend that his injury resulted from a reduction in competition.[15]

For these reasons, it is the Court's conclusion that Count One must be dismissed.

### III Second Claim: Third–Party Beneficiary

Plaintiff alleges next that the consent decree is a contract binding on NYNEX,

**10.** Obviously, a judicial consent decree is not an "antitrust law."

**11.** Plaintiff attempts to distinguish *Paul M. Harrod* by suggesting that it turns on the fact that references to the consent decree would prejudice the jury and that references to it were readily excisable. The explanation is patently false. The court in that case flatly decided that to "permit a private party to recover damages for violation of any provision of [a government antitrust decree] is so obviously beyond the scope of the term 'antitrust laws,' as used in the statute, as to require no further discussion." 194 F.Supp. at 504. And the court went on to say that in view of its dismissal of the counts in the complaint referring to the antitrust decree that these counts would be ordered stricken.

**12.** Plaintiff misconstrues *Thomason* and *Haigh* by claiming that they distinguish *Ostrofe* on the facts without rejecting its holdings (Opposition at 23 n. 16). *See Thomason*, 701 F.Supp. at 1570 ("if Thomason is correct in his allegations [that

defendant fired him for refusal to engage in illegal conduct] he has suffered injury; but that harm cannot be redressed under the Sherman and Clayton Acts"); *Haigh*, 676 F.Supp. at 1346 ("again, this Court must reject the *Ostrofe* analysis").

**13.** In *Ostrofe*, the plaintiff was an essential participant in a scheme to fix prices and allocate customers; in *Donahue*, the plaintiff was likewise the means by which the defendant had imposed the illegal resale price maintenance scheme.

**14.** The loss of employment by plaintiffs in *Adams* satisfied this standard because it was directly caused by the predatory destruction of their employer by competitors. 828 F.2d at 17.

**15.** It appears to be plaintiff's theory that his termination was carried out in connection with the cessation of a business that was violating the *AT & T* decree. Even if true, that is not an "antitrust injury."

and that NYNEX employees are third-party beneficiaries of that contract. He further claims that his termination violated the decree because it resulted from his efforts to clarify and rectify NYNEX's breaches of the decree, and that as a third-party beneficiary he is entitled to recover. That claim, too, must fail.

■ First. Plaintiff's claims to third-party beneficiary status rest on a provision of the consent decree (Section V) requiring the Regional Companies to advise employees on their obligations under the decree. This provision is one of a number intended to ensure compliance with the decree. While it requires employees to comply with the decree, there is nothing in Section V, anywhere else in the decree, or in the Court's explanations of the decree,[16] to provide, or even to suggest, that employees of the Regional Companies were intended to benefit from it, as distinguished from being required to comply with it.[17]

■ Second. Even if there were some merit to the decree analysis, plaintiff could still not prevail, for it is well established that a private party cannot sue as a third-party beneficiary of a government consent decree. *Control Data Corp. v. IBM Corp.*, 306 F.Supp. 839, 846–48 (D.Minn.1969), *aff'd sub nom. Data Processing Financial & General Corp. v. IBM Corp.*, 430 F.2d 1277, 1278 (8th Cir.1970); *Cinema Service Corp. v. Twentieth Century–Fox Film Corp.*, 477 F.Supp. 174, 178 (W.D.Pa.1979); *May Department Stores Co. v. First Hartford Corp.*, 435 F.Supp. 849, 852–53 (D.Conn.1977); *National Union Electric v. Emerson Electric Co.*, [1981–82] Trade Cas. ¶ 64,274 (N.D.Ill.1981). *See also, Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975); *Federal Trade Commission v. Owens–Corning Fiberglas*, 853 F.2d 458, 464 (6th Cir.1988) (Clayton Act

does not create a private enforcement remedy).

Plaintiff's arguments to the contrary misrepresent the law and are otherwise unpersuasive. Thus, plaintiff quotes *Control Data* as declining to express an opinion on the issue of whether the decree conferred rights on third-party beneficiaries. Not only is the language plaintiff purports to quote (Opposition at 24) taken wholly out of context, but *Control Data* categorically rejected the third-party beneficiary theory after discussing it thoughtfully and at some length.[18]

Equally unhelpful are plaintiff's citations to third-party beneficiary cases involving consent agreements under the civil rights statutes and other areas of the law, given the ample authority in the antitrust area itself. Indeed, several of the cited cases expressly recognize the well-settled law in the antitrust area and do not contest that authority. *See, e.g., Coca–Cola Bottling Co. v. Coca–Cola Co.*, 654 F.Supp. 1419, 1437–39 (D.Del.1987) ("cases involving antitrust consent decrees have hewed closely to the *Blue Chip* rule barring any person not directly participating in the consent decree from suing to enforce its terms"); *Virgo v. Local Union 580*, 107 F.R.D. 84, 91 (S.D.N.Y.1985).

The second count will be dismissed.

### IV *Third Claim: Written Employment Contract*

Plaintiff claims next that he entered an oral two-year non-cancellable employment contract with the defendants which they breached by terminating him without cause. Defendants argue that the claim should be dismissed because there is no written contract or memorandum satisfying the Statute of Frauds.

For purposes of this motion, it is undisputed that the plaintiff and James Jewett,

---

**16.** *See* 552 F.Supp. at 143.

**17.** There is not the slightest support for plaintiff's flat statement that the "intent of the AT & T consent decree specifically to benefit management employees is beyond cavil" (Opposition at 24).

**18.** In view of the lengthy discussion supporting the *Control Data* court's conclusion that antitrust consent decrees may not be enforced by third parties, it is difficult to ascribe Rafferty's assertion that the court declined to "express an opinion" on that issue (Opposition at 24) entirely to inexperience.

president of Telco, entered an oral employment contract on April 30, 1986 that specified a $70,000 salary plus bonuses and required Rafferty not to compete with Telco for at least three years if he left the company. In a deposition, Jewett acknowledged that there was a contract, but he disagreed with Rafferty about its terms. Specifically, he maintained that the contract was terminable at will,[19] while Rafferty asserts that for the first two years he could not be terminated except for cause.

■ Jewett's deposition testimony waives any application of the Statute of Frauds by admitting that there was, indeed, a contract. *Wemhoff v. Investors Management Corp.*, 455 A.2d 897, 899 (D.C.App.1983); *Hackney v. Morelite Construction*, 418 A.2d 1062 (D.C.App.1980). To waive application of the Statute of Frauds, the admission need not include all of the terms of the contract, but only those sufficient to conclude that an agreement existed. *Wemhoff v. Investors Management Corp.*, 528 A.2d 1205, 1207–08 (D.C. App.1987).[20]

■ Even without that admission, defendants could not assert the Statute of Frauds because of the doctrine of equitable estoppel. *Tauber v. District of Columbia*, 511 A.2d 23, 27 (D.C.1986). Equitable estoppel bars a party from asserting the Statute of Frauds when its own fraud is responsible for the absence of a written agreement. Jewett's alleged promise to reduce the contract to writing "as soon as possible" and his subsequent failure to do so, brings the contract within the doctrine

for purposes of a motion for summary judgment.[21]

For these reasons, the Court will deny defendants' summary judgment motion with respect to the claim for breach of employment contract.

## V  *Fourth Claim: Oral Contract Modification*

■ Plaintiff's next claim is based upon an alleged modification of the oral contract discussed *supra*. Plaintiff alleges that Engkvist promised him in an August 29, 1986 telephone conversation that if his division were ever closed, he would be offered employment with another NYNEX company, but that when Telco was later closed no such offer was forthcoming.

■ Even if these assertions are factually correct—which the Court will assume for purposes of the motion—they fail to state a claim cognizable at law. Plaintiff does not contend that there was a bargained-for exchange.[22] Engkvist did not ask Rafferty to do anything in return for the promise, and Rafferty made no offer to do so. At most, Engkvist made a gratuitous promise, and it is therefore not enforceable. *See Price v. Mercury Supply Co.*, 682 S.W.2d 924, 932 (Tenn.App.1984); *Murray v. Lichtman*, 339 F.2d 749, 751–52 (D.C.Cir.1964).[23] Under Tennessee law, the rule is that an oral contract for lifetime, permanent, or indefinite employment is a hiring terminable at will when the employee furnishes no consideration other than the services required in the agreement. *Savage v. Spur Distributing Co.*, 33 Tenn.

**19.** Jewett Deposition at 186, 191, 202.

**20.** Defendants' argument that because Jewett denied plaintiff's claim to a two-year contract, the *Wemhoff* rule does not apply (Reply at 15–16) is contradicted both by the *Wemhoff* decisions themselves and by *Hackney* which expressly states that the Statute of Frauds is waived if the defendant as much as admits to the existence of the contract. *Id.* at 1067.

**21.** Whether Jewett had the intent to commit a fraud when he apparently made the promise is a matter which, of course, must be left for trial.

**22.** The complaint alleges that defendants' commitment was given "[i]n consideration for [his] continued efforts to develop Telco consulting" (Complaint, ¶ 37). However, plaintiff was already obligated to advance that objective.

**23.** Rafferty relies on *Barger v. General Electric Co.*, 599 F.Supp. 1154, 1161 (W.D.Va.1984), for the proposition that his continued service constituted consideration. However, not only did *Barger* involve special facts (the existence and distribution of a handbook to govern layoffs) but it applied only Virginia law, recognizing that on the broad issue the jurisdictions are severely split.

App. 27, 228 S.W.2d 122, 124 (1950).[24]

The fourth count will be dismissed.

## VI *Fifth Claim: Misrepresentation*

Rafferty alleges that NYNEX and Telco made two misrepresentations to him: (1) Engkvist told him that the Department of Justice had approved and authorized the NYNEX's acquisition of Telco; and (2) Jewett told him through an executive recruiter that Telco's consulting division had revenues of $1 million a year.[25] The claim based on these alleged misrepresentations must likewise be dismissed.

▮▮▮▮▮ In the first place, plaintiff's memorandum in opposition to the motion for summary judgment offers no rebuttal to defendants' assertion that the claim should be dismissed because it fails to state any legally cognizable injury. On that basis, plaintiff may be deemed to have conceded the issue, and since there was therefore a failure to assert an injury recognized by law, the claim may be deemed to be fatally defective.[26]

However, in order not to penalize plaintiff for his inexperience (*see* pp. 326–327, *supra*), the Court has examined the complaint to determine whether the claim could survive defendants' motion. This examination reveals that nothing in that complaint or in plaintiff's other voluminous filings supports the notion of a legally-recoverable injury.[27]

The complaint does allege that the misrepresentations exposed him to potential criminal liability, resulted in his precipitous termination, damaged his professional rep-

utation, and violated his principles. Amended Complaint, ¶¶ 47, 48.

▮▮▮▮ The claim for exposure to criminal liability is plainly too uncertain and too speculative for recovery; Rafferty has never been charged with anything related to this case, and there is not the slightest indication that he ever will be.[28] Similarly, nothing in the record support Rafferty's claim of damage to reputation; indeed, the record refutes the assertion.[29] The claim that these misrepresentations caused his termination founders on the fact that the dismissal left Rafferty exactly where he asserts he would have been without the misrepresentation: without a job at Telco. Finally, as concerns the claim of injury to his principles, which plaintiff characterizes as "most important" of all, it is of course, not an injury cognizable at law.

## VII *Sixth Claim: Wrongful Discharge*

Plaintiff finally asserts that NYNEX officials caused Jewett to discharge him because he sought legal advice as to the application of the decree and because they knew that he would not conduct or participate in unlawful activities for which he was an essential participant. He further maintains that the manner of his termination constituted retaliation for his refusal to participate in these illegal activities or to conceal them from the Department of Justice. Defendants argue that these allegations do not state a claim upon which

---

24. In his deposition testimony, plaintiff·stated that he "had a commitment of employment for the indefinite future." Rafferty Deposition at 857.

25. There is considerable dispute between the parties about exactly what was said to whom. It appears, however, that ambiguous statements were made that could have left Rafferty with the impression upon which he now relies.

26. Both in Tennessee and in the District of Columbia, while a plaintiff need not, at this stage, show the amount of the damages, he is obligated to show that they exist and are not entirely speculative. *See, e.g., Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 233 (Tenn.App. 1977); *Naartex Consulting Corp. v. Watt*, 722

F.2d 779, 793 n. 22 (D.C.Cir.1983); W. Prosser & W. P. Keaton, *Torts* § 110 (5th ed. 1984).

27. It is therefore not necessary to explore defendants' several other defenses to this claim.

28. NYNEX, on the other hand, has been indicted for alleged violations of the decree. *See United States v. NYNEX Corporation*, Criminal No. 90–0238 (D.D.C.1990).

29. Rafferty testified that several of Telco's customers have either recommended him for other positions or are willing to do so, Deposition at 1047, 1103–04, and that he was able to secure a comparable consulting position at the Diebold Group. *Id.* at 1501.

relief may be granted.[30]

■ Wrongful discharge is an evolving tort, and the status of the law varies substantially from state to state.[31] In Tennessee, an exception to the at-will termination doctrine for retaliatory discharges appears to be recognized at the present time (although only with respect to certain relatively narrow situations). *Chism v. Mid–South Milling Co.*, 762 S.W.2d 552 (Tenn. 1988). *See also, Watson v. Cleveland Chair Co.*, 122 L.R.R.M. 2076, 2078 (Tenn. App.1985). On the other hand, "the District of Columbia does not currently recognize a public policy exception to the at-will termination doctrine." *Hall v. Ford*, 856 F.2d 255, 267 (D.C.Cir.1988).[32] *But see, Buttell v. American Podiatric Medical Ass'n*, 700 F.Supp. 592, 600 (D.D.C.1988); *Alder v. Columbia Historical Soc.*, 690 F.Supp. 9, 16 (D.D.C.1987); *Wemhoff v. Investors Management Corp., supra*, 528 A.2d at 1208 n. 3; *and see Edwards v. Habib*, 397 F.2d 687 (D.C.Cir.1968).

In view of the failure of the parties to take unequivocal stands on and properly to brief the choice of law issue which may govern resolution of the substantive question (which is itself not entirely clear in either of the two jurisdictions), the Court will deny the motion for summary judgment, without prejudice to its renewal on the basis of further briefing.

## VIII Punitive Damages

The complaint asks for punitive damages[33] under the second, fifth, and sixth claims.[34] The issue needs to be considered only with respect to Count Six, the wrongful discharge claim, since the other relevant claims are being dismissed.

■ There is no question but that punitive damages may be awarded in egregious circumstances, in cases of fraud, malice, oppression, reckless disregard for the rights of others, or indifference to the consequences,[35] where a contract claim merges with one for tort or violation of public policy.[36] While the Court has not rendered a final decision with respect to the wrongful discharge claim since both the proper choice of law and the appropriate substantive standard to be applied are still in doubt (*see* Part VII, *supra*), at least for present purposes it is clear that the punitive damage claim should not be dismissed.

■ Plaintiff has alleged that various officials connected with defendants saw to

---

**30.** In addition to arguing that no cause of action for wrongful discharge is recognized in either Tennessee or the District of Columbia, defendants maintain that this claim should be dismissed because plaintiff was fired for business reasons and not as a consequence of his actions under the decree. But that is an issue of fact not amenable to resolution on the instant motion.

**31.** Both parties have taken positions on the law applicable to this claim that are at odds with those they have taken elsewhere in these filings. Plaintiff argues elsewhere that District of Columbia law governs this case, Opposition at 29 n. 24; but with respect to this count he suggests variously that New York, District of Columbia, and Tennessee law are applicable. Opposition at 36 n. 29. Defendants, meanwhile, have asserted elsewhere that the case is governed by Tennessee law, Motion at 52, while relying here principally upon District of Columbia law.

**32.** Plaintiff distorts the *Hall* decision, claiming that it deals only with the political rights of public employees (Opposition at 35) when that was but one of the questions considered by the court. His further attempt to denigrate the Court of Appeals opinion by characterizing it as dictum and as relying on a D.C. Court of Ap-

peals *en banc* decision without precedential value must likewise fail, for this Court is certainly bound by plain language of the U.S. Court of Appeals.

**33.** In the original complaint, the demand was for $1 million; that demand has now been increased, without explanation, to $2 million.

**34.** In his opposition to the summary judgment motion, plaintiff also discusses the third and fourth claims, but that opposition cannot enlarge upon the complaint.

**35.** *Nepera Chemical, Inc. v. Sea–Land Service, Inc.*, 794 F.2d 688 (D.C.Cir.1986); *Price v. Griffin*, 359 A.2d 582, 589 (D.C.App.1976); *Washington Garage Co. v. Klare*, 248 A.2d 681, 684 (D.C. App.1968). *Irving Pulp & Paper v. Dunbar Transfer*, 732 F.2d 511, 516–17 (6th Cir.1984); *National Polymer Products v. Borg–Warner Corp.*, 660 F.2d 171, 183 (6th Cir.1981); *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn.1975); Prosser & Keeton on Torts § 2 at 9–10 (5th ed. 1984).

**36.** *Bedell v. Inver Housing, Inc.*, 506 A.2d 202, 206 (D.C.App.1986).

it that he was discharged because he would not participate in or cover-up activities which violated the *AT & T* decree or were otherwise unlawful. He also claims that retaliatory measures were taken when he would not cooperate in these unlawful activities. These steps by defendants, if they can be proved, would be sufficiently egregious as well as oppressive of the rights of others [37] that a jury might be justified in awarding punitive damages therefor.

To be sure, punitive damages are not automatically available in every wrongful discharge case, or even in every case where the discharge is effected as retaliation for the exercise of lawful activities; however, assuming that plaintiff's claims in that respect are supported by the facts, the Court will not rule out such damages at the summary judgment stage.[38]

### Order

For the reasons stated,[39] it is hereby

ORDERED that the first, second, fourth, and fifth claims be and they are hereby dismissed; and it is further

ORDERED that defendants' motion for summary judgment be and it is hereby denied with respect to the third and sixth claims; and it is further

ORDERED that defendants' request for a dismissal of the claim for punitive damages be and it is hereby denied.

---

37. *Nepera Chemical, supra,* 794 F.2d at 689.

38. NYNEX is subject to punitive damages only if its officers ordered, participated, or ratified the outrageous conduct. *See Hammerman v. Peacock,* 607 F.Supp. 911, 919 (D.D.C.1985). Decision on that issue may have to await the production at trial of plaintiff's evidence.

39. In line with his not unusual practice in this Court, in the Court of Appeals, and before the Magistrate, of seeking, somehow, to tie together all of his disparate disputes, claims, and procedural involvements wherever they may be pending, plaintiff attempts to reserve the right to supplement the facts for purposes of the summary judgment motion pending the resolution of such matters as disputes over discovery orders, discovery sanctions, and what are claimed to be improper Fifth Amendment claims by defendants' employees. Opposition at 39 n. 35. The Court denies the request insofar as it seeks a unilateral right to adduce more facts following an advisory opinion to plaintiff regarding the sufficiency of the facts he has adduced thus far. However, the Court will consider a stay of the remainder of the summary judgment issues, as well as of other proceedings, pending the resolution of discovery or other matters, should either party so request.